William H. Kenner, et al., [1] v. Commissioner. Kenner v. Commissioner
Docket Nos. 59068, 59069, 59823, 74307, 76717, 76999.
United States Tax Court
T.C. Memo 1961-37; 1961 Tax Ct. Memo LEXIS 311; 20 T.C.M. (CCH) 185; T.C.M. (RIA) 61037; February 15, 1961
Cecil L. Cass, Esq., for the petitioners. Paul Levin, Esq. and Joel Yonover, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MURONEY, Judge: Respondent determined deficiencies in petitioners' tax and additions to tax as follows: Kenner's Charitable Hospital, Inc. - Docket No. 59823
Additions to the Tax
Sec. 293(b),
Sec. 291(a),
Year
Kind of Tax
Deficiency
1939 Code
1939 Code
1944
Income
$ 3,896.00
$ 1,948.00
$ 974.00
1945
Income
5,763.14
2,881.57
1,440.79
1946
Income
32,285.96
16,142.98
8,071.49
1947
Income
32,285.97
16,142.99
8,071.49
1948
Income
25,973.09
12,986.55
6,493.27
Declared Value Excess Profits Tax
1944
11,215.12
5,607.56
2,803.78
1945
11,215.12
5,607.56
2,803.78
Excess Profits Tax
1944
57,667.00
28,833.50
14,416.75
1945
54,177.95
27,088.98
13,544.49
*313 Kenner's Charitable Hospital, Inc. - Docket No. 76999
Additions to the Tax
Sec. 291(a), 1939 Code
Year
Kind of Tax
Deficiency
Sec. 6651(a), 1954 Code
1949
Income
$26,789.86
$ 6,697.47
1950
Income
43,854.74 **
10,963.69
1951
Income
70,577.73
17,644.43
1952
Income
50,334.79
12,583.70
1953
Income
98,240.97
24,560.24
1954
Income
58,013.81
14,503.45 *
By amended answer and by amendment to the amended answer filed in Docket No. 76999 the Commissioner claimed additional deficiencies in tax and additions to the tax for the years 1952, 1953 and 1954 as follows: Additions to the Tax
Sec. 291(a), 1939 Code
Year
Kind of Tax
Deficiency
Sec. 6651(a), 1954 Code
1952
Income
$ 51,740.17
$12,935.04
1953
Income
102,163.11
25,540.78
1954
Income
60,657.84
15,164.46 *
William H. Kenner - Docket No. 59068
Additions to the Tax
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
Year
Kind of Tax
Deficiency
1939 Code
1939 Code
1939 Code
1944
Income
$59,025.19
$29,512.59
$3,541.51
1945
Income
77,032.54
38,516.27
$7,697.01
4,618.21
1946
Income
65,934.59
32,967.30
6,583.36
3,950.02
1947
Income
62,664.85
31,332.43
6,811.03
4,086.62
*314 By amendment to the amended answer filed in Docket No. 59068 the Commissioner claimed additional deficiencies in tax and additions to the tax for the years 1944, 1945, 1946, and 1947, as follows: Additions to the Tax
Sec. 294
(d)(1)(A),
Sec. 294(d)(2),
Year
Kind of Tax
Deficiency
1939 Code
1939 Code
1944
Income
$60,670.46
$3,640.23
1945
Income
78,084.56
$7,021.98
4,681.33
1946
Income
83,323.33
7,490.01
4,493.34
1947
Income
62,664.85
6,811.03
4,086.63
William H. Kenner and Eleanor V. Kenner - Docket No. 59069
Additions to the Tax
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
Year
Kind of Tax
Deficiency
1939 Code
1939 Code
1939 Code
1948
Income
$35,098.52
$17,549.26
$3,501.93
$2,101.16
William H. Kenner and Eleanor V. Kenner - Docket No. 76717
Additions to the Tax
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
Year
Kind of Tax
Deficiency
1939 Code
1939 Code
1949
Income
$ 46,514.93
$ 4,961.16
$3,307.43
1950
Income
64,432.22
5,678.68
3,785.78
1951
Income
83,701.26
8,030.12
5,353.41
1952
Income
59,146.02
3,555.79
1953
Income
114,970.80
11,744.39
7,829.59
*315 By amended answer and by amendment to the amended answer filed in Docket No. 76717 the Commissioner claimed additional deficiencies in tax and additions to the tax for the years 1949 and 1950 as follows: Additions to the Tax
Sec. 294
(d)(1)(A),
Sec. 294(d)(2)
Year
Kind of Tax
Deficiency
1939 Code
1939 Code
1949
Income
$57,560.38
$5,222.70
$3,481.79
1950
Income
71,670.87
6,923.52
4,615.67
William H. Kenner and Eleanor V. Kenner - Docket No. 74307
1954
Income
$86,934.38
$9,372.10
$6,079.20
These consolidated cases deal with income tax and additions to tax of two petitioners: Kenner's Charitable Hospital, Inc. and William H. Kenner, an individual (in several years joined with his wife by virtue of filing joint returns). The issues for decision are: 1. Whether petitioner hospital corporation qualified for tax exemption during the years 1944 through 1954 under sections 101(6) and 501(c)(3) of the Internal Revenue Codes of 1939 and 1954, respectively, and if it was not exempt, what its taxable income was for those years; and 2. The correct taxable income of the individual petitioners *316 for those years. In the statutory notices for the individuals respondent determined that the hospital was not a separate entity for tax purposes and that its income was taxable to them. Respondent also determined in the alternative that if the hospital was a separate entity, certain amounts should be added to the Kenners' income as dividends or inurements of the earnings of the hospital to their benefit. At trial respondent elected to stand on the position that the hospital was a separate entity. Respondent has conceded that no additions to tax under section 293(b), Internal Revenue Code of 1939, are due in any year. Findings of Fact Some of the facts have been stipulated and they are found accordingly, except in so far as arithmetical errors appear. Petitioner, Kenner's Charitable Hospital, Inc., hereafter sometimes called the hospital, was organized and incorporated in 1933 in Illinois. It has its principal place of business at Chicago and kept its records on a calendar year basis. For the years 1933 through 1954 it filed no corporate Federal income tax returns. Petitioners, William H. and Eleanor V. Kenner, are husband and wife and during the years in question they resided *317 in Chicago. The several issues for decision in this case primarily concern the activities of William H. Kenner. He will hereafter sometimes be referred to as Kenner. For the years 1944 through 1947 Kenner filed individual Federal income tax returns with the then collector of internal revenue for the first district of Illinois. For the years 1948 through 1951 he and his wife filed joint Federal income tax returns with the said collector. For the years 1952 through 1954 they filed joint returns with the district director of internal revenue at Chicago. Kenner is a medical doctor. He graduated from medical school in 1926 and after an intership, practiced medicine as a contract surgeon for the United States Army. In 1930 he began a private practice at 716 Wellington Avenue in Chicago. In 1932 Kenner purchased the Wellington Avenue premises for about $1,000 cash and the assumption of an $8,000 mortgage. In 1933 Kenner's Charitable Hospital, Inc. was organized and incorporated under the laws of Illinois with Kenner, his wife and an attorney as the original incorporators. The incorporators were termed "members" of the corporation. The members appointed the hospital board of directors. At *318 the outset the board of directors included Kenner, the attorney, two of Kenner's brothers-in-law and two of his cousins. The membership of the board changed from time to time over the years. However, most of the directors who served during the years in question were members of Kenner's immediate family or his relatives. During all the years of the hospital's existence Kenner was in complete effective charge of it. He acted in various capacities such as president, administrator and house physician. The hospital was solely a Kenner family organization. The corporate charter originally provided that the corporation was established to provide free, charitable hospital rooms and treatment to deserving members of [several named fraternal organizations] and all other regularly constituted fraternal organizations and their recognized affiliate bodies, and all others who may be sent by any member of the aforementioned bodies, whether affiliated or not. In 1939 the articles of incorporation were amended as to the objects for which the corporation was formed. The amendment related that the corporation was formed: to furnish free, charitable hospital rooms and equipment for treatment *319 to all who apply for hospitalization regardless of race, creed or color or regardless of their ability to pay; * * * all of the foregoing to be done not for pecuniary profit. In 1949 the hospital amended its articles of incorporation somewhat and was approved under the Illinois General Not For Profit Corporation Act. When the hospital began to function in about 1934, Kenner purchased a nearby residence for use as a nurses' home. The purchase price was $1,000 in cash and the assumption of an $8,000 mortgage. In 1936 Kenner conveyed the Wellington Avenue premises and the nurses' home to the hospital corporation. In 1946 the hospital sold its old premises at 716 Wellington Avenue. It received $60,000 as the price for the hospital and its equipment as a going concern. This amount did not include the nurses' home which was later sold for about $15,000. In 1946 Kenner and his wife entered into a contract to purchase property located at 3150 Lake Shore Drive, Chicago, and late in that year the property was deeded to Kenner. The price for this lot and the building on it was $155,000. Kenner began immediately to convert the premises into a hospital. In November 1946 the new premises *320 were visited by a city building inspector who told Kenner that the operation of a hospital at that location was in violation of an area zoning ordinance. Subsequently the Chicago City Council changed the zoning of the location to permit the operation of a hospital. By 1950 the hospital had a full staff of 45 and was operating at a capacity of about 65 beds. In the years prior to 1944 Kenner purchased six farms in northern Illinois. He took an active part in their operation and management. Between 1944 and 1950 two bank accounts were maintained in the hospital's name in Chicago banks: in the Aetna State Bank, Chicago, between January 1, 1944 and December 10, 1947, and in the City National Bank, Chicago, from December 14, 1946 until sometime in 1950. On January 1, 1944 the hospital's account at the Aetna State Bank had a balance of $10,377.79. Prior to 1949 no systematic financial records of any sort were ever kept of hospital operations. From sometime prior to the year 1944 until 1950 Kenner indiscriminately commingled his own personal funds and those of the hospital in these two bank accounts. In 1950 the hospital bookkeeper recommended that hospital funds be kept separate from *321 Kenner's and thereafter separate bank accounts were established. In addition to the hospital bank accounts, Kenner maintained an account in his own name in a bank in Woodstock, Illinois, from 1944 through 1946. For these three years eight deposits were made in amounts totaling $19,299.12 and 21 checks were cleared for the same total amount. Kenner also maintained an account in his own name in a Huntley, Illinois, bank between 1944 and 1954. For the years 1944 through 1951, 28 deposits were made totaling $88,668.30; during the same period 135 checks cleared the bank totaling $88,820.02. [2] The Huntley and Woodstock banks were located in towns near which farms owned by Kenner were located. From 1944 through 1954 Kenner borrowed various sums of money, some of which he used for improving his farms or for the purchase of real property or livestock. Some of the borrowed money was used to purchase equipment for the hospital or to pay various operating expenses of the hospital. Neither Kenner nor the hospital kept any accurate records of the amounts of the loans nor the purpose to *322 which the proceeds were put. When applying for loans in his own name Kenner often included the hospital among his personal assets. On October 28, 1948, he filed an application for a loan with the Lotus Production Credit Association. The amount of the loan was to be $21,000. The specific purpose of the loan as stated on the application was to build a new barn for heifers on one of his farms. Kenner there listed income from sources other than farming as $25,000 from medical practice and the hospital. (On his income tax return for 1948 he reported total receipts from medical practice of $16,859.63 and total wages from the hospital of $2,400.) Among his assets of $475,000 on the application Kenner listed a 75 bed hospital at 3150 Lake Shore Drive having a value of $300,000. Among his indebtedness of $78,000 he listed an indebtedness of the hospital of $50,000. Funds derived by Kenner from his private practice, from various loans and from the operation of his farms were deposited in the accounts kept in the hospital's name in the two Chicago banks and in the Woodstock and Huntley banks. Kenner kept no accurate records of his earnings from farming or from his medical practice. Funds *323 from the accounts kept in the hospital's name in the Chicago banks were withdrawn by Kenner and used indiscriminately to pay hospital expenses, his personal and farming expenses, and to repay loans. No systematic records were kept of the purpose to which funds withdrawn from these accounts were put. The only amounts that can be traced as the personal funds of Kenner deposited by him in the hospital account are $5,253.33 deposited in 1944 and $25,786.98 deposited in 1946. The parties have stipulated that at least amounts of $1,891.12, $1,143.49, and $7,184.36 in 1944, 1945 and 1946, respectively, were withdrawn by check from the bank accounts bearing the hospital's name and used to pay expenses for Kenner's farms. In addition, in 1946 three checks totaling $13,771.87 were cleared on the hospital's account and used to repay three of Kenner's personal loans. The parties have also stipulated that Kenner withdrew or caused to be withdrawn from the hospital bank account $75,563.54 in 1947, $60,876.21 in 1948, $49,292.94 in 1949 and $6,686.96 in 1950. These amounts were used by him to pay personal and farm expenses. In 1946 when the old hospital premises were sold, Kenner and his family *324 moved to a residence at 632 Oakdale Avenue, some four blocks from the new hospital. At this time, as during most of the other years here in question, Kenner was managing director of the hospital, and a member of its board of directors, which was appointed to office by Kenner and his wife. In 1947 and 1948 checks drawn on the hospital bank account were used to pay gas, electricity, rent and telephone expenses of Kenner's personal residence at 632 Oakdale in amounts of $76.57 and $237.60, respectively. In 1949 a bookkeeper was engaged to set up a system of books and prepare financial statements for the hospital. For the years 1949 through 1954 amounts for gas, electricity, telephone, rent and laundry of Kenner's private residence were paid by hospital check and treated as charges against hospital income on the hospital's books. These amounts were: 1949, $966.89; 1950, $1,482.67; 1951, $1,456.97; 1952, $865.70; 1953, $1,600.10; 1954, $1,292.03. Sometime in 1951 an apartment was rented at 3101 North Sheridan Road, Chicago. During the years 1951 through 1954 the rent on this apartment was paid by hospital check and charged against hospital income in amounts as follows: 1951, $560; 1952, *325 $960; 1953, $960 and 1954, $755. In addition, in 1952 amounts totaling $182 were withdrawn from the hospital bank account and charged as an expense on the books of the hospital to an account entitled "Staff Maintenance Quarters." Gustav E. Beerly was an attorney who, at various times, represented Kenner in some of his loan and real estate transactions. Beerly represented the hospital from time to time in loan and real estate transactions, and served on its board of directors. In addition, he also loaned money to both Kenner and the hospital. In 1946 Beerly aided in the sale of the old hospital premises. Also in March 1946 Beerly loaned Kenner $9,000, taking as security a mortgage on some of Kenner's farm land. On March 20, 1947 a trust indenture was entered into as a second mortgage between the hospital and Beerly for $125,000 with the new hospital premises given as security. In 1947 and in prior years Beerly had given Kenner and/or the hospital legal assistance in numerous borrowing transactions. On June 17, 1947 and again on August 4, 1947, checks were drawn on the hospital account payable to Beerly, each for $500. The check stub of the June 17 check bears the legend "prof. services, *326 $500.00." The check stub for the August 4 check bears the legend "Interest $500.00." The parties have stipulated that in 1948 two checks, among others, were drawn on the hospital bank account payable to cash. One, dated April 13, 1948 was drawn for $11,000 and endorsed by Kenner. The second, dated November 17, 1948, was drawn for $500 and endorsed by Kenner's wife. At about this time Kenner was attempting to have the zoning of the residential area in which the hospital premises was located changed. On several occasions amounts were paid for this purpose. In December 1947 Kenner applied for a loan of $35,000 from John Hancock Mutual Life Insurance Company at 4 percent interest payable semiannually. The terms of the loan provided for the payment of $1,000 at the end of one year and for prepayment of principal in multiples $100of. Security for the loan was a portion of Kenner's farm property. The purpose of the loan as stated on the application was to build a new barn and to modernize two farm residences. The parties have stipulated that a check for $1,475 was drawn on the hospital bank account, charged as an expense of the hospital and made payable to John Hancock Mutual Life Insurance *327 Company on December 9, 1948. In the years 1949, 1953 and 1954 amounts of $74.50, $27 and $18.70, respectively, were paid by hospital check or by cash and charged as an expense on its books. These amounts were for dues and magazine subscriptions for such magazines as Chicago Farmers, Magazine Mart, Kiplinger Washington Letter, American Remount Assn., Hoards Dairyman and Consumer's Research. The hospital had waiting room facilities. In 1953 the amount of $27 for the Kiplinger Washington Letter was billed to Kenner's residence at 632 Oakdale. In 1949, 1950, 1951, 1953 and 1954 the hospital paid by check or in cash $65.86, $1,084.54, $151.54, $1,665.75 and $551.51, respectively, for gasoline, automobile repairs, miscellaneous automobile expenses and fines. In all the years mentioned these amounts were charged as an expense against income on the hospital books. Most of the purchases of gasoline were made by using hospital credit cards. Many of the credit slips were signed by Arthur Schambach who worked for Kenner on his farm. Many of the charges were incurred either in the area of Antioch, Illinois, where the Kenner's farms were located, or in the southwestern part of the United States *328 In 1951 bills totaling $34.88 contained notifications to the effect that they were for "Kenner Farms" and items totaling $72.71 were for automobile insurance. During the years 1950, 1951 and 1953 amounts of $811.62, $241.66 and $259.21, respectively, were withdrawn through petty cash or by check and charged as an expense against hospital income. These amounts were expended for whiskey, rum, bitters, wine, champagne and other liquor. During 1950, $303.90 was withdrawn from hospital petty cash, charged as an expense against hospital income and expended by Kenner for round-trip air travel to Tucson, Arizona. It is stipulated that amounts of $398.45, $53.54 and $333.75 were withdrawn in 1949, 1950 and 1951, respectively, from the hospital bank account, charged as expenses against hospital income and expended for miscellaneous expenses such as labor on farms, an advertisement to sell an automobile, halters, lead belts, poultry bags, slaughtering a hog and scavenger costs. Kenner had two sons, William H. Kenner, III, and John D. Kenner. Both did various odd jobs at the hospital from time to time. William did some clerical work, tended the hospital boilers, shoveled snow and did some *329 of the purchasing of supplies. John emptied garbage, tended the lawns and did general maintenance work around the hospital. William attended college in the Chicago area and graduated in 1949. During 1949 and until June of 1950 he took graduate work at several Chicago area colleges and carried an academic load of 12 hours per semester. From January through June of 1951 he operated a business in Antioch, Illinois, and would often remain there for several weeks at a time without returning to Chicago. From August 1951 to August 1952 he was employed in Chicago as a securities salesman. From August 1952 until August 1953 he worked full time for an insurance company. In 1949, 1950 and 1951 William received $1,800 a year from the hospital. In 1952 he received $3,600 and in 1953 he worked at the hospital for about nine months and received $2,250. John attended a Chicago college on a full time basis from 1946 to 1950. He was paid $1,800 by the hospital in 1949 and again in 1950. On March 17, 1950 Kenner organized the Altar Land and Cattle Company, hereafter sometimes called Altar, under the laws of Arizona, with 886 shares of stock outstanding. During the years 1950 through 1954 Kenner owned *330 884 shares of its stock and two other persons each held a single share as his nominee. In April 1950 Altar entered into an agreement to purchase the land, buildings and personal property comprising the Lazy-V Ranch located some 25 miles from Tucson, Arizona, for $85,000. The agreement excepted from its terms about 10.8 [3] acres immediately surrounding the dwelling known as the Hill House. Under the terms of purchase as modified in May 1950, Altar was to pay $40,000 cash in June 1950, $25,000 on or before October 1, 1950 and the balance of $20,000 on or before January 1, 1951. The payments were to be made to the Canyon State Land Company. The books of the hospital carried an account, #1470, to which were charged amounts expended on Arizona properties. On June 9, 1950 a hospital check was drawn payable to Altar for $15,000 and charged to account #1470 on the hospital books. The check had the following legend on the back: Deposit as earnest money on 99 yr. lease for lease of land and buildings in Tucson, *331 Arizona; and land on the Lazy-V Ranch, consisting of all buildings on the Lazy-V Ranch and 300 acres on which the buildings are located on the Southeast corner known as the Lazy-V Ranch. Buildings and land to be used for purposes specified in our 99 year lease. The check was endorsed by Kenner as president of Altar, paid to the Canyon State Land Company and applied as a part of the initial payment on the Lazy-V land. On December 13, 1950 the hospital borrowed $44,000 and gave the lender a chattel mortgage on its equipment as security for the loan. On December 12, 1950 the hospital drew a check for $45,000 made payable to a Chicago bank for credit to the account of the vendor of the Lazy-V. This amount was charged to account #1470 on the hospital's books and resulted primarily from the proceeds of the loan mentioned above. Title to the Lazy-V property subject to the purchase agreement was conveyed to Altar by deed executed June 10, 1950 and recorded December 28, 1950. [4]
In June 1950 Altar entered into a contract to purchase two parcels of *332 improved real estate, together with inventory and furnishings, known as the Royal Hotel and the El Sahurao Apartments located in Tucson, Arizona. The purchase price was $140,000. Under the terms of the transaction Altar deposited $2,500 with the sellers, paid a real estate agent $7,500, assumed a mortgage of $45,799.51, contracted to pay the sellers $74,200.49 in installments and paid the balance of $9,282.70 to an escrowee. [5] The sellers gave the contract of sale and the mortgage to a Tucson bank for collection. The payments of principal and interest on the mortgage were $607.80 a month and the payment on the contract of sale was $400 a month, a total of $1,007.80. On August 18, 1950, a check was written on the Kenner Farm Account at the Belmont National Bank of Chicago payable to the collection agent bank in Tucson for $1,007.80 in payment of the August amount due on the mortgage and sale contract. On August 22, 1950 the hospital issued a check to Altar for $1,250 which was endorsed by petitioner and deposited in the Kenner Farm *333 Account at the Belmont Bank in Chicago. On September 21, 1950 a hospital check, charged to account #1470 on the hospital's books, was drawn payable to the Tucson collection agent for $1,007.80 and sent in payment of the mortgage and sales contract charges for September. The same procedure was followed for the months of October 1950 through February 1951. From March through November 1951 hospital checks charged on the hospital books to account #1470 were drawn for $1,250 payable to Altar. Altar deposited the checks in its bank account in Tucson and in turn issued its own check for $1,007.80 to the Tucson collection agent. Altar sold the Royal Hotel and El Sahurao Apartments property in December 1951 for $135,000. During the time these properties were owned by Altar they were operated by a resident manager who was hired and directed by Kenner. Altar reported gross income from rents of $13,750 on its amended income tax return for 1951. During 1950 the parties have stipulated that two checks, one for $242.20 and one for $800, were drawn on the hospital account payable to Altar, endorsed by Kenner and deposited in the Kenner Farm Account at the Belmont Bank. Also, in 1950 two more *334 checks were drawn on the hospital account, payable to Altar. One for $242.20 was used by Kenner to pay his New York Life Insurance Company premium and the second, also for $242.20, was endorsed by Kenner for Altar and deposited in another Chicago bank. In 1951 three checks, two for $242.20 and the third for $450, were drawn on the hospital account payable to Altar and deposited in the farm account at the Belmont Bank. Two writings were drawn each bearing the date July 1, 1950, each stating in its opening sentence in identical language THIS LEASE Made and entered into this 1st day of July, 1950, in the State of Arizona, County of Pima, by and between The Altar Land and Cattle Company, a corporation, organized and existing under the laws of the State of Arizona, hereinafter referred to as lessor, and Kenner's * Charitable Hospital, Inc., a non-profit corporation, an Illinois corporation doing business in the State of Arizona and hereinafter designated as lessee, * * * On its face one document purported to lease both the Tucson property (Royal Hotel and El Sahurao Apartments) and a portion of the Lazy-V Ranch described *335 as Those certain buildings described as the main house, the guest house, the caretaker's house and the cook house, together with the landscaped area and the swimming pool located [metes and bounds] and known as the Rincon Ranch, * * * It then goes on to recite that it is for a 10-year term at a monthly rental of $1,250, renewable for a second 10 years. It further provides that the lessee will remodel the premises at its own expense so as to provide a first-class hospital, sanatorium or convalescent home. The second document covers only the Rincon property which is described in identical language except for the last phrase which reads "and known as the Lazy V Ranch." It then goes on to recite that it is to be for a term of 25 years renewable for a 10-year term and recites: The lessor cannot terminate lease at any time without it being agreed upon by the Board of Directors of Kenner's Charitable Hospital, Inc. The indicated rental is $1 per year. It also includes a clause similar to that contained in the first which states that the lessee shall make improvements to the property to provide for a hospital. In March 1953 Kenner entered into a preliminary contract for the purchase *336 of the 10.8 acres, including land and improvements and furnishings, known as Hill House, which were excluded from the prior sale of the Lazy-V land. The purchase price of $43,750 was to be paid in two amounts: $20,000 as an original payment and the balance of $23,750 plus interest on or before April 1, 1954. In June 1953 the hospital executed a chattel mortgage pledging its goods and chattels as security for a loan of $20,000. The mortgage was signed by Kenner as the hospital's president. The lender issued its check for $20,000 payable to the hospital. It was endorsed and cashed by Kenner and used for the down payment on the Hill House property. In 1953 six checks totaling $12,000, and in 1954 three checks totaling $8,000 were drawn on the hospital bank account, charged to account #1470 on the hospital books and used to repay the above loan. On April 5, 1954 the hospital drew a check for $25,750 payable to its Arizona attorney who, later the same month, paid the balance of $25,203.56 due on the Hill House property for Kenner. On its books the hospital charged this check to account #1470. In March 1954 a trust agreement was entered into between a professional trustee and the following *337 persons as beneficiaries: Kenner and his wife as to a 5/26 interest; Kenner's son John and his wife as to a 2/26 interest; Kenner's son William as to a 3/26 interest; Rita Schultz, a hospital employee, as to a 3/26 interest; one Mary Kirkley as to a 3/26 interest; and the hospital as to a 10/26 interest. The agreement provided that the trustee was to take title to the Hill House property. It further stated that the duties of the trustee were to (a) Sell under Contract or convey any lot of the Trust Property to any party upon receiving written instructions so to do from the majority in interest of the Beneficiaries or their duly appointed agents. (b) Hold said property for the order of the Beneficiaries as set forth herein and not convey or encumber in any manner whatsoever said property or any portion thereof to any person or persons except as set forth herein. The seller of the Hill House property conveyed title to the trustee the same day the trust agreement was entered into. This deed was subsequently recorded. By deed entered into in March 1957 and subsequently recorded the trustee conveyed the Hill House property to the hospital. On June 28, 1952 Kenner filed an application *338 for a loan with the Northeast Illinois Production Credit Association (formerly the Lotus Production Credit Association). The amount of the loan was to be $20,000. The purpose stated was to purchase cattle. On the application, Kenner listed as part of his total assets of $540,900 a ranch in Arizona valued at $150,000 and the Kenner Hospital valued at $300,000. Other loan applications made by Kenner in 1953 and 1954 also included the value of the Arizona property as part of his assets. After the acquisition of the several Arizona properties numerous improvements and repairs were made to them. The name Lazy-V Ranch was changed to Rocking K Ranch. For clarity we will continue to refer to it as the Lazy-V. This property at the time of its purchase by Altar contained something less than one section of land, and was improved by two houses, a swimming pool, servant's and chauffeur's quarters, two garages, an old barn and several corrals and shanties. The Hill House property comprised about 10 acres located on the southeast edge of the Lazy-V. At the time of its purchase by Kenner it was improved with two houses, a cottage and a pump house. In the southeast corner of the Lazy-V property, *339 adjoining the Hill House property, is a ten-acre plot which was occupied by the Rincon Sanatorium, hereafter sometimes called Rincon. During the years 1950 through 1954 the Rincon property was improved by converting a garage into a coffee shop, adding several rooms to the servant's quarters, tearing down barns and outbuildings and erecting a commissary. Between 1950 and 1954 many additional improvements were made on the Lazy-V property, exclusive of the 10 acres occupied by Rincon. In 1952 two existing houses for hired help received new roofs, a porch, plumbing, interior partitions, painting, a pump, a 1,000 gallon water tank and electricity. About 1952 or 1953 an equipment shed, a horse barn and a hog barn were built. In 1953 or 1954 a turkey house and several pens and corrals were erected. In 1954 a scale house, a feed trough and a trench silo were constructed. During this period a slaughterhouse containing refrigeration equipment was built as a place to slaughter poultry and cattle. Improvements were also made on the Hill House property. A poultry house was built there about 1952 and certain additions were made to the main Hill House residence between 1954 and 1956. The *340 hospital books under account #1470 contained asset accounts for the repairs and additions made to the residences for hired help on the Lazy-V property. In December 1952 there were debit entries totaling $11,000 entered in these accounts. During 1952, $3,559.43 was charged to account #1470 for work done to one of the residences for hired help on the Lazy-V property. An additional $25 was charged to account #1470 for work done to the same residence in 1953. Also, in 1953, $500, and in 1954, $106.25 were charged to account #1470 for work done to the slaughterhouse. During 1954 at least $3,533.89 was charged to account #1470 for work done on a barn on the Lazy-V property. The hospital was not reimbursed for any of these expenditures. In 1954 a contract was entered into between the hospital and Tony Bonillas, an Arizona contractor, to raze certain buildings, repair others and make certain improvements. The work was to be done for $4,500. The contract was marked "Paid in Full" and signed by Bonillas. On September 28, 1954 Bonillas executed a waiver of mechanics' liens which stated that the consideration for the waiver was $4,500. This amount was paid by hospital checks. Also during 1954, *341 $14,000 was paid to local dirt contractors for construction of dams, flood walls and reservoirs. After much of this work was completed it was discovered that it had been done on land which belonged to the State of Arizona. At least $12,500 of the amount was paid in 1954 by hospital checks signed by Kenner. Several of the checks bore legends such as "on a/c: contract for clearing ground @ T.B. colony for Rincon Sanitorium." The work described above was in the nature of flood control. Floods in this area endangered the slaughterhouse, corrals and other buildings on the Lazy-V property. Kenner ran cattle on pasture in Arizona. The pasture had been sprayed to kill unwanted brush. In 1954 a rain washed sprayed leaves into a pond from which the cattle drank. As a result 39 cows and 36 calves died. They were buried with a bulldozer. On August 26, 1949 the hospital filed an exemption affidavit claiming exemption from Federal income tax under section 101(6), Internal Revenue Code of 1939. By letter dated October 10, 1949, the Bureau of Internal Revenue declared the hospital was entitled to the exemption. By letter dated September 11, 1951, the exemption ruling was revoked. Petitioner, *342 Kenner's Charitable Hospital, Inc., filed no income tax returns for any of the years in question. Respondent audited the available records of the hospital and determined that it was not exempt from Federal income tax. In the absence of adequate records, respondent determined the hospital's income for the years 1944 through 1947 by the net worth method, as follows: Computation of Net Income by New [Net]
Worth Method for the Years 1944,
1945, 1946, and 1947
Net Worth of Kenner Charitable
Hospital, Inc. as of December 31,
1948 without regard to funds with-
drawn without consideration by
William H. Kenner from the Hos-
pital, in 1947 and 1948
$272,260.21
Funds withdrawn by William H.
Kenner from the Hospital in 1947
and 1948 without consideration
195,942.27
Net Worth of Kenner Charitable
Hospital, Inc., as of December 31,
1948
$468,202.48
Net Worth of Kenner Charitable
Hospital, Inc., as of January 1,
1944 as determined
60,000.00
Increase in net worth of Kenner
Charitable Hospital between Janu-
Ary 1, 1944 and December 31, 1948
$408,202.48
Income of Kenner Charitable Hospi-
tal for Taxable Year Ending De-
cember 31, 1948, as determined
68,350.23
Income of Hospital for Years 1944,
1945, 1946, and 1947
$339,852.25
*343 On basis of the above computation, your income for the respective years has been adjusted in the following amounts: 1944
$ 84,963.06
1945
84,963.06
1946
84,963.06
1947
84,963.07
$339,852.25
For the years 1948 through 1954 respondent determined the hospital's net taxable income using financial statements prepared by the hospital bookkeepers as a basis for the determination. Respondent determined the hospital's income by this method as follows: Year
Amount
1948
$ 68,350.23
1949
70,499.63
1950
91,706.14
1951
111,879.01
1952
79,763.98
1953
148,201.38
1954
122,141.95
By amended answer in Docket No. 76999 respondent claimed increased deficiencies for the years [6] 1952, 1953 and 1954 and alleged that the correct amounts of unreported income were $81,771.68, $150,327.08 and $127,226.62, respectively. In explanation, respondent alleged that $2,007.70, $2,125.70 and $5,084.67 in 1952, 1953 and 1954, respectively, were paid by the hospital to satisfy Kenner's personal obligations and that respondent had failed to take these amounts into consideration as nondeductible expenses in the original determination of deficiency. *344 By amendment to the amended answer in Docket No. 76999 respondent claimed an increased deficiency for 1953; alleged that the hospital's net taxable income for that year was $153,804.44; [7] and further alleged that the figure $2,125.70 in the amended answer representing amounts allegedly paid by the hospital for Kenner's personal expenses should be increased to $4,603.06. *345 On brief, respondent made certain concessions concerning the amounts of hospital income. These amounts, after the concessions, are as follows: Year
Amount
1948
$ 58,225.91
1949
55,479.74
1950
84,362.18
1951
103,628.59
1952
81,771.68
1953
153,804.44
1954
124,759.17
William H. Kenner filed individual or joint income tax returns for each of the years in question. In general, the returns reported income from his private practice, token amounts of salary from the hospital ( $200 per month for most years and $1,000 per month for the last several years in question), losses from his farming operations and from time to time dividends or capital gains. In the original deficiency notices respondent made numerous adjustments on each of Kenner's returns. Many of these adjustments have been conceded by either Kenner or respondent. We will describe briefly only the portions of the deficiency notices which relate to items still in issue. For the years 1944, 1945 and 1946 respondent, by amended answer in Docket No. 59068, claimed *346 that amounts of $1,891.12, $1,143.49 and $20,956.23 had been expended by the hospital in Kenner's behalf. These are the only amounts remaining in issue for these years. In the notice of deficiency for 1947 respondent determined, among other items, that Kenner had additional "Income from other sources," i.e., the hospital, of $84,963.07. Of this amount, $76,640.11 remains at issue. In the notice of deficiency for 1948 respondent determined, among other items, that Kenner had additional "Income from other sources," i.e., the hospital, of $68,350.23. By amended answer, respondent claimed that this amount should be increased to $73,851.21, consisting of withdrawals from the hospital bank account $60,876.21, the proceeds of two checks for $11,000 and $500 drawn to cash on the hospital bank account and a $1,475 check drawn on the hospital account used to pay principal and interest on a loan from the John Hancock Mutual Life Insurance Company. The amended answer for this year did not include a claim for increased deficiency. In the deficiency notice for 1949 respondent determined the amount of Kenner's deficiency to be $46,514.93 on the basis of a "Net income adjusted" figure of $115,187.01. *347 This figure included "Unreported income" of $75,996.67. In explanation of this latter amount respondent stated in the deficiency notice that the hospital was not considered a separate taxable entity and its income of $75,996.67 was, therefore, taxable to Kenner. The deficiency notice then explained "as an alternative," that if the hospital was a separate entity, Kenner had derived income from it of $101,927.13. This latter amount included [8] personal expenses paid by the hospital of $53,715.89 (later conceded to be $50,798.64), salaries paid by the hospital to Kenner's sons of $3,600 and cash withdrawn from the hospital of $15,000. Thus, the amount of income from the hospital in issue is $69,398.64. Also in 1949 respondent disallowed farm expenses of $26,813.56 claimed in Kenner's 1949 return. After certain concessions $5,878.21 of farm expenses remains in issue. By amended answer respondent claimed the deficiency for 1949 to be $57,560.30 and alleged that during 1949 Kenner had a long-term capital gain of $11,623.89 from the sale of livestock, the $5,811.95 taxable portion of which had not been reported as taxable income. *348 In the notice of deficiency for 1950 respondent determined, among other items, that Kenner had "Net income adjusted" of $133,308.70 from which the amount of the deficiency $64,432.22 was determined. This amount included $88,334.82 net income of the hospital. The deficiency notice also included as an alternative position, similar in all respects to that described above as to 1949, that Kenner had derived income from the hospital of $144,016.68. This latter amount included [9] personal expenses of Kenner paid by the hospital of $11,681.79 (later reduced by concession to $10,423.23), salaries paid by the hospital to Kenner's sons of $3,600, and expenditures made by the hospital on Kenner's behalf in Arizona of $100,977.75. Thus the amount of income from the hospital in issue is $115,000.98. By amended answer respondent claimed that the deficiency for 1950 was $64,362.21. By amendment to the amended answer respondent prayed that the deficiency for 1950 be increased to $71,670.87. [10]
*349 In the notice of deficiency for 1951 respondent determined, among other things, that Kenner had unreported income from the hospital of $54,461.08. This amount included [11] personal expenses of Kenner paid by the hospital of $2,743.92, salary paid by the hospital to one of Kenner's sons of $1,800, expenditures made by the hospital on property in Arizona of $25,366.33 and sale of farm produce to the hospital of $2,419.29. Thus the total amount in question on these issues is $32,329.54. In the notice of deficiency for 1952 respondent determined, among other things, that Kenner had unreported income from the hospital of $45,597.69. This amount included [12] $3,600 paid by the hospital to one of Kenner's sons and $27,583.20 expended by the hospital on property in Arizona. By amended answer respondent alleged that Kenner had received additional income of $2,007.70 from amounts paid by the hospital on his behalf. The total amount in issue is $33,190.90. In the notice of deficiency *350 for 1953 respondent determined, among other things, that Kenner had unreported income from the hospital of $79,740.60. This amount included [13] $2,250 paid by the hospital to one of Kenner's sons, $58,823.06 expended by the hospital on Arizona property and $5,520.97 from sale of farm produce to the hospital. Thus the amount of additional income in issue is $66,594.03. Respondent disallowed farm expenses of $17,483.08 claimed in Kenner's 1953 return. Of this amount, $10,570.64 arising from a claimed loss of the sale of livestock remains in issue. By amended answer respondent alleged Kenner had additional income from the hospital of $5,084.67. Of this amount $2,789.01 has been conceded by respondent on brief, leaving $2,295.66 [14] at issue. In paragraph 7(i) of the amended answer in Docket No. 76717 respondent alleged: (i) That during the year 1953 the *351 petitioners derived taxable income from Kenner's Charitable Hospital, Inc. in the amount of $2,125.70 [15] by reason of money paid to or on behalf of petitioner, William H. Kenner, which amount they failed to report on their 1952 [16] income tax return. In the notice of deficiency for 1954 respondent determined, inter alia, that Kenner had unreported income - in the amount of $105,292.04, derived by you from the business operated under the name of Kenner Charitable Hospital, has been included in income under section 61 of the Internal Revenue Code of 1954. By amended answer filed at trial respondent - 4(d). Admits that in determining the taxable income of petitioners the Commissioner added an item of income in the amount of $105,292.04. Alleges that the correct amount of this item should be $88,807.55. * * * *352 7. Further answering the petitioner the respondent alleges: (a) That during the year 1954 the petitioners derived taxable income of $5,084.67 from [the hospital] by reason of expenditures made on their behalf * * * (b) That during the year 1954 the petitioner, * * * received taxable income of $80,122.88 by reason of money paid by [the hospital] for capital improvement and expenses of certain properties located in Arizona owned by him and/or * * * Altar * * *. [17]
Respondent has conceded $2,467.45 of the $5,084.67. Also in the original deficiency notice for 1954 respondent disallowed farm expenses of $11,470.28, disallowed a deduction of $700 for sick pay exclusion and disallowed $2,134.40 for business expenses. Respondent has conceded that $4,149.86 of the farm expense item was properly deductible, leaving a total of $7,320.42 at issue, consisting of a loss on livestock of *353 $6,290 and other farm expenses of $1,030.42. In the notices of deficiency in all dockets respondent determined additions to tax. These additions to tax are fully set forth at the end of this opinion. Opinion Hospital Exemption and Income There is no question of the bar of the statute of limitations for any of the years involved in this case. Section 101(6) of the Internal Revenue Code of 1939 and its successor section 501(c)(3) provide, in identical language, that an organization will be considered exempt from tax when it is "organized and operated exclusively for * * * charitable * * * purposes * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual * * *." The first issue is whether Kenner's Charitable Hospital, Inc. was, in its organization and operation, a tax-exempt corporation under the above statutes. Respondent determined it was not. The question is one of fact upon which the hospital has the burden of proof. Cummins-Collins Foundation, 15 T.C. 613. The provisions of its charter would indicate the hospital meets the test of "organization" for purposes specified in the statutes. Respondent argues the *354 hospital failed to meet its burden of showing the "operation" of the hospital during each of the years in question was exclusively for charitable purposes and failed in its burden to show that no part of the net earnings of the hospital inured to the benefit of any individual. While respondent argues several disqualifying aspects in the hospital operation, the argument largely centers around the inurement test. We agree with respondent that the hospital failed to show that no part of its net earnings inured to the benefit of any individual. Its earnings during all of the years in question were deposited in various banks in Chicago in bank accounts in the hospital's name. During the years in question prior to 1950 checks on these bank accounts, admittedly in the total sum of at least $230,000 went for the payment of Kenner's farm, personal, and living expenses. Clearly, in the face of such a record, the hospital cannot argue "no part of the net earnings" during said years inured to the benefit of any individual. But the hospital argues these payments from its bank accounts to or for Kenner were merely repayment of monies advanced the hospital by Kenner. Neither Kenner nor the hospital *355 kept any records of any advancements. The hospital relies entirely upon the unsubstantiated testimony of Kenner to the effect that he had deposited money in the hospital's bank account in excess of the sums withdrawn for his benefit. He was the founder, director, and general manager of the hospital and wrote checks on its bank accounts. He merely testified that his advancements to the hospital always exceeded the money he withdrew for his farm, personal and living expenses. When asked how he could know this without keeping records, he answered: "Well, because I know that I didn't draw out as much as I put in. That is how I know." We will have more to say with respect to evidence concerning Kenner's advancements when discussing issues related to the hospital's and Kenner's income but on the issue presently considered, that is the taxexempt status of the hospital, it is enough to say Kenner's testimony is wholly insufficient to overcome the presumption and the natural inference that the hospital was not so operated during the years 1944 to 1949, inclusive, that its net income inured in part to his benefit. During the years 1950 through 1954 the hospital kept records and these records *356 show that during said years about $290,000 of its funds were spent to pay for the purchase and improvement of various parcels of Arizona realty bought by Kenner and his wholly-owned corporation, Altar. Once again the hospital produced Kenner as its witness to explain away the presumption and the obvious inference that the hospital was operated during said years so that a part of its income inured to the benefit of Kenner. He explained two of the parcels, The Royal Hotel and El Sahurao Apartments in Tucson, were really purchased as a site for a proposed sanatorium under a plan whereby Altar would take title and later convey title to the hospital. It was his story that the property was later found to be unsuitable for a sanatorium and some 18 months later the two parcels were sold by Altar. The other parcel purchased by Altar was the Lazy-V cattle ranch, consisting of a section of land located about 25 miles from Tucson. This, too, according to Kenner's story, was really the purchase of a future sanatorium site to be owned and operated by the hospital. The parcel purchased by Kenner was the 10-acre tract on the Lazy-V ranch called Hill House where the ranch dwelling and other buildings *357 are located, which tract had not been included in Altar's purchase of the ranch. Again it was Kenner's story Hill House was to be the site of the hospital's future sanatorium. There was vague testimony concerning purported leases which may or may not have been executed between Altar and the hospital covering some of the parcels Altar purchased. No sanatorium was ever operated on the premises although Kenner did, in 1954, some four years after he purchased Hill House, transfer it to a trustee and three years later the trustee transferred it to the hospital. Once again we hold Kenner's testimony and the other evidence concerning the planned Arizona sanatorium, entirely insufficient to overcome the presumption of correctness of the Commissioner's determination and the obvious inference that the hospital was not operated during the years 1950 through 1954 so that no part of its net earnings inured to his benefit. There is much additional evidence in this record showing the use of the hospital funds for Kenner's personal benefit. Much of it is detailed in our findings of fact and also in our discussion of other issues in the following pages of this opinion. It all presents a picture *358 of hospital operation where its income was to be used at will for Kenner's personal benefit. On this record Kenner's Charitable Hospital, Inc. has failed to prove that no part of its net earnings inured to the benefit of any individual during any of the years 1944 through 1954. We hold it is not entitled to an exemption from corporate income tax for those years. In the absence of adequate records, respondent determined the hospital's income for the years 1944 through 1947 by a net worth method. We have set forth respondent's computation in our findings of fact. It is presumptively correct. The hospital attacks this computation by arguing that the amount of funds withdrawn by Kenner from the hospital account were not withdrawn without consideration and that the amount of the closing net worth as of December 31, 1948 was overstated "by approximately $180,000.00." Respondent's net worth determination places Kenner's withdrawals from the hospital in 1947 and 1948 at $195,942.27. The parties stipulated at the trial that in 1947 and 1948 Kenner withdrew "at least" a total of $162,761.46 from the hospital account. Respondent has conceded that $12,032.54 of Kenner's withdrawals was for *359 corporate expenses and not income to the hospital, leaving agreed withdrawals by Kenner of at least $150,728.92 from the hospital account for these two years. The hospital contends this amount was not withdrawn without consideration. Except for this statement on brief the hospital presents no further argument on this point but we think the hospital's contention is that Kenner was merely withdrawing money he had previously advanced. We do not accept the latter contention but on the record presented we feel justified in saying that $195,942.27 figure in the net worth computation of Kenner's withdrawals in 1947 and 1948 should be reduced to $150,728.92. This is in accord with the stipulated figures. Even though the stipulation uses the phrase "at least", the parties seem to construe the pertinent paragraphs of the stipulation as fixing the figures to be used as withdrawal sums. At least that is the hospital's construction in its brief and respondent does not argue otherwise in its reply and respondent used the figure $150,728.92 in computing Kenner's income for 1947 and 1948. The funds in the commingled accounts which were carried under the hospital's name, as we have pointed out *360 in our findings of fact, came from hospital operations, from Kenner's medical practice and from his farming operations. In addition, the evidence shows Kenner borrowed substantial amounts of money during the period covered by the net worth statement. No records were kept of the source from which the deposits in the hospital account came. The hospital's argument is that we should infer that the substantial amounts borrowed by Kenner or derived from his income-producing sources were all deposited in the account. The hospital's only evidence is that in a few isolated instances sums deposited corresponded in amount with loans made about the same time. There are too few of these instances shown for us to infer a pattern of behavior that loans were deposited from which, in turn, we might infer that all borrowed funds were deposited. The hospital has not shown that any substantial portion of the proceeds of Kenner's loans was deposited in this account, nor has there been presented any evidence from which we can find that the stipulated amount of withdrawals was in any way derived from deposits of nonhospital funds. Therefore, except in so far as the stipulated amount of withdrawals mentioned *361 above departs from respondent's original figure, the hospital has failed to show respondent's determination erroneous in this respect. The hospital's second attack on the net worth computation is that the closing net worth was taken from a hospital balance sheet prepared by the hospital bookkeeper on which the hospital assets had been recorded at value rather than at cost. Respondent's closing net worth figure as of December 31, 1948 was $272,260.21. The hospital argues that this figure is overstated by "approximately $180,000.00" but offers no evidence as to what the correct cost figure should be. Clearly, cost, rather than value, should be the basis for inclusion of the hospital assets in net worth. We think it is established that the balance sheet from which the $272,260.21 figure is derived does not represent the cost of the hospital assets on December 31, 1948 and that the cost of these assets is something less than this sum. But we are without evidence as to cost basis of any of the equipment possessed by the hospital on December 31, 1948. At that time it was equipped, staffed and operating. The purchase price of the land and building in 1946 not then adapted for hospital *362 use was $155,000. Kenner's loan application to the Lotus Production Credit Association dated October 1948, which we have set forth in our findings of fact, shows the hospital valued at $300,000 and subject to an indebtedness of $50,000. Exercising our best judgment on the basis of the entire record we find that the net worth of the hospital on December 31, 1948 was $250,000. Cohan v. Commissioner, 39 F. 2d 540. Respondent, in the net worth computation, subtracted the amount he had determined as hospital income in 1948, derived from the figures appearing on the hospital financial statement for that year. On brief he has conceded that this amount should be reduced to $58,225.91. The hospital has pointed to no inaccuracy in the amount of 1948 income and the hospital presents no specific argument concerning the amounts of hospital income for the years 1949 through 1954. However, there are several adjustments which the evidence shows should be made. In the original determination of Kenner's individual deficiency respondent included amounts for the value of hospital facilities used by him in his private practice. In the determination of hospital income respondent included *363 as "Unallowable Expenses" these same amounts which were there described as "Benefits Inured to Dr. Kenner for value of Hospital facilities used by him" as follows: $12,057.10 in 1949, $15,564.23 in 1950, $15,191.54 in 1951, $11,704.49 in 1952, $13,146.57 in 1953 and $13,249.91 in 1954. Respondent conceded these amounts in Kenner's individual deficiencies. There is no indication in the record that the hospital charged these amounts as expenses against its income. Also, these amounts are in addition to other sums expended by the hospital on Kenner's behalf which the hospital treated on its books as an expense of its operations. There should be no inclusion of the value of the facilities used by Kenner in the hospital's income. These amounts will be excluded from the computation of the hospital's income for these years. In determining the hospital's income respondent disallowed as expenses $1,800 paid to each of Kenner's sons in 1949 and 1950, and amounts of $1,800 in 1951, $3,600 in 1952, $2,250 in 1953 and $3,600 in 1954 paid to William. No evidence was presented on this issue concerning the year 1954. As to it, $3,600 is disallowed as a hospital expense. For the other years, each *364 son testified about the work he did which was of a casual and unskilled sort. We are convinced that both did some work for the hospital but there is no evidence at all of the amount of time they devoted to this work. It is at least clear that the amounts paid for these odd jobs were in excess of their value and a portion of the amounts is not deductible. Therefore, in the exercise of our best judgment, taking into account all the facts of record, and with particular notice of the fact that during these years John worked at the hospital while in full time attendance at college and that William worked at the hospital while attending school or while elsewhere employed, we hold that the hospital is entitled to deduct $500 per year for amounts paid John in 1949 and 1950 and $500 per year for amounts paid William in the years 1949 through 1953. Cohan v. Commissioner, supra. By amended answer respondent claimed increases in the hospital's income of $2,007.70 in 1952, $2,125.70 [18] in 1953 and $5,084.67 in 1954. These represent amounts for rental of apartments at 632 Oakdale and 3101 North Sheridan in 1952 and 1953 and $182 stipulated as "Unidentified charges against 'Staff *365 Maintenance Quarters'." These rental and utility payments are discussed below in connection with Kenner's individual deficiencies. In accord with that discussion we here hold respondent has carried his burden of proof with respect to $865.70 in 1952 and $1,065.70 in 1953, representing rental of the apartment at 632 Oakdale used by Kenner as his residence. Respondent has not carried that burden with respect to the rental of the apartment at 3101 North Sheridan Road, nor with respect to the $182 item for 1952 described above as to which no evidence appears. We are unable to identify the $5,084.67 item raised by the amended answer for 1954 or find its counterpart in the record or find it explained in respondent's brief. Accordingly, we hold respondent has failed in his burden of proof as to this item. In all respects other than those set out above respondent's determination of the hospital's income for the years 1944 through 1954 is approved. Kenner's Income Respondent determined deficiencies in Kenner's income for the items remaining in issue by making specific adjustments and additions to Kenner's income as reported *366 in his returns. We will discuss them in the order in which they appear in our findings of fact. Because of new matter raised by respondent by amendment to his answer, respondent has the burden of proof on some of the issues we will discuss. Some of the issues will be decided on the failure of one of the parties to meet his burden of proof. Most of the amounts which respondent included as income to Kenner are items which the hospital treated as expenses of its operations. As to these items, Kenner may meet his burden in two ways. First, by showing that the items in question were actually legitimate expenses, in the income tax sense, of the hospital corporation operations. Second, even if Kenner cannot show the item was a bona fide expense of the hospital's operations, it will still be excluded from his income if he shows that the expenditure was not spent on his behalf. The only amounts remaining in issue in 1944, 1945 and 1946 are amounts which the parties have stipulated were withdrawn from the commingled hospital account to pay Kenner's personal and farm expenses in the amounts of $1,891.12 in 1944, $1,143.49 in 1945 and $20,956.23 in 1946. The amounts for these years were claimed *367 by respondent by amended answer. This constitutes new matter and respondent admits he has the burden of proof. [19]
The sum of the evidence for those years for which no records were kept may be readily summarized. A common bank account was maintained in the hospital's name into which were deposited funds of untraceable origin derived from the hospital and from Kenner's borrowings, private medical practice and farm operations. Out of this account were withdrawn amounts which were used to buy hospital equipment and to pay hospital, farm and personal expenses. In order to carry his burden, respondent must show that the funds withdrawn by Kenner were hospital funds and not amounts resulting from the deposit of Kenner's monies. Aside from the fact of the commingled account itself, *368 the only evidence to support respondent's position is the stipulation showing the amounts in question were withdrawn from the account and used for Kenner's personal purposes. This is not sufficient to prove that the amounts withdrawn were hospital funds and not Kenner's own money. Further, respondent admits on brief that $5,253.33 in 1944 and $25,786.98 in 1946 could be traced into the hospital accounts as Kenner's funds. Accordingly, we hold that withdrawals from the hospital account of $1,891.12 in 1944, $1,143.49 in 1945 and $20,956.23 in 1946 may not be included in Kenner's income in those years. The parties agree that sums totaling $75,563.54, $60,876.21, $49,292.94 and $6,686.96 in the years 1947 through 1950, respectively, were paid from the hospital account for Kenner's personal and farm expenses. Kenner has the burden [20] of proving, in effect, that the amounts withdrawn were his own and not the hospital's funds. Kenner argues that he deposited *369 sums from non-hospital sources during this period in excess of the withdrawals. Although there is evidence of Kenner's extensive borrowing activities during these years, there is no evidence that the amounts earned or borrowed were deposited in the bank account. We cannot presume that they were. In his reply brief Kenner has set forth a schedule by which he attempts to show that between 1943 and 1950 he "advanced" to the hospital $112,887.83. The record does not support the schedule. Our examination of the evidence fails to disclose many of the amounts Kenner used in the schedule. We hold Kenner has failed to prove that the amounts in question were incorrectly included in the determination of his income for the years 1947 through 1950. For the years 1947 through 1954 the hospital paid rent and incidental expenses (in stipulated amounts) such as gas and electricity at the 632 Oakdale residence, located some four blocks from the hospital, where Kenner lived with his wife and family. Respondent's position is that the amounts so expended were income to Kenner. Kenner has the burden of proof for the years 1947 through 1951. Respondent admits he has the burden of proof for the years 1952 *370 through 1954 because the issue was first raised in his amended answer for those years. Kenner argues that his lodgings were furnished for the convenience of his employer, the hospital, and, therefore, do not constitute income to him as an employee. Prior to the enactment of section 119, Internal Revenue Code of 1954, the problem of maintenance for the convenience of the employer fell within the general provisions of section 22(a), Internal Revenue Code of 1939. Where quarters are furnished for the convenience of the employer, their value is not includible in the employee's gross income. Regs. 118, sec. 39.22(a)-3; Joseph L. Doran, 21 T.C. 374. Kenner must show that his residence, located four blocks from the hospital, was maintained solely for the hospital's convenience. The only evidence on this point is Kenner's testimony that he acted as house physician for the hospital and that in this capacity he was constantly on call. These amounts were paid at a time when Kenner made substantially all of the financial decisions of the hospital in one capacity or another. On cross-examination Kenner testified that he had authorized the hospital to pay *371 the expenses of his personal residence and stated, "The board [which he and his wife appointed and of which he was a member] had employed me as house physician and as a house physician I was entitled to maintenance * * *." Kenner's evidence at best does no more than to show that the 632 Oakdale residence was maintained for his own convenience. In addition, we think his own testimony shows that he considered his "maintenance" a part of the compensation due him in his capacity of house physician. This falls directly within the language of Regs. 118, sec. 39.22(a)-3. The amount here involved was compensation. Herman J. Romer, 28 T.C. 1228. We hold as to the years 1947 through 1951 amounts expended at 632 Oakdale by the hospital were correctly determined by respondent to be income to him. As to the years 1952 and 1953, respondent has carried his burden of proof and the stipulated amounts were compensation and should be included in Kenner's income. The year 1954 is governed by section 119(2), Internal Revenue Code of 1954, which provides that the value of lodging furnished by the employer may be excluded from an employee's gross income if the employee *372 is required to accept such lodging on the business premises of his employer as a condition of his employment. It is abundantly clear from the record that no such condition existed in the year 1954. Respondent has met his burden of proving that the amounts paid for the residence at 632 Oakdale should be included in Kenner's income for 1954. In 1951 the hospital began to pay rent on an apartment at 3101 North Sheridan Road. Kenner testified that in about 1950 or 1951 the Health Department of Chicago began to require that a house physician live within a block of the hospital and because of this rule the hospital rented the 3101 apartment across the street from the hospital. He further testified that he or any other doctor or member of the hospital staff who was "on duty" at the hospital would stay at this apartment. Kenner's testimony on this point, though otherwise unsubstantiated, is believable and we accept it. As with the issue concerning the apartment at 632 Oakdale, Kenner had the burden of proof for 1951 and respondent for 1952, 1953 and 1954. We hold that no amounts expended by the hospital for the maintenance of the apartment at 3101 North Sheridan Road should be included in *373 Kenner's income for the years 1951 through 1954. By amended answer for 1952 respondent raised the question of the stipulated amount of $182 for staff maintenance quarters. As to this item respondent has the burden of proof. No evidence has been introduced on this issue. We hold respondent is not entitled to include this amount in petitioner's income for 1952. In 1947 two checks were drawn on the hospital account totaling $1,000 payable to Beerly, an attorney. At trial, Kenner, when asked whether he could state the purpose of these payments, answered "No, I cannot state." On brief Kenner argues only that Beerly was the attorney for the hospital and the $1,000 "certainly would be considered Hospital expense and not inurement to the benefit of * * *" Kenner. The record shows Beerly acted for both Kenner and the hospital on many occasions. Kenner has the burden of proving respondent's determination incorrect on this issue. He has failed to do so. We hold respondent correctly included the $1,000 in Kenner's income for 1947. In 1948 two checks were drawn on the hospital account payable to cash. One, for $11,000 was endorsed by Kenner and the other for $500 was endorsed by Kenner's *374 wife. A third check for $1,475 was drawn in 1948 on the hospital account payable to the John Hancock Mutual Life Insurance Company. Respondent raised the issue of these amounts by amended answer and admits that as to them he has the burden of proof. In explanation of the cash items Kenner testified somewhat vaguely that the $11,000 amount was expended in attempting to change the zoning of the area in which the new hospital was located and that the $500 item was for the hospital payroll. Respondent argues only that Dr. Kenner did not say to whom he paid these monies, he kept no record of the payments, he did not know or remember who was in his presence when the monies were paid nor the dates or places when these payments were allegedly made. Even assuming this argument is an accurate analysis of the record, respondent cannot carry his burden merely by pointing out the shortcomings in Kenner's testimony. Even though these amounts came from the commingled account, in the absence of proof that these amounts were paid from hospital funds and were not paid for hospital expenses, we hold respondent is not entitled to include $11,500 in Kenner's income for 1948. Although the payment *375 of $1,475 to the insurance company is a somewhat closer question, if only because a few more facts are available concerning it, we believe that here too respondent has failed in his burden. It fairly appears that the $1,475 was in repayment of one of Kenner's personal obligations but the repayment came from the commingled account. Respondent has not proved that hospital funds instead of Kenner's own funds were used for the $1,475 payment. We hold respondent is not entitled to include this $1,475 in Kenner's income for 1948. In the years 1949, 1953 and 1954 stipulated amounts totaling $120.20 were paid by the hospital for certain magazine subscriptions, detailed more fully in the findings of fact. Kenner has the burden of proof for 1949 and 1953 that these amounts were not expended for his benefit. The amount in issue in 1954 was raised by amended answer and respondent admits that as to it he has the burden of proof. Respondent's theory of this case is that the hospital was a hospital that operated for profit. Presumably it had some waiting room facilities. It is understandable such a hospital would have some magazine subscriptions. Kenner testified the magazines were all for use *376 in the hospital. Respondent's argument is merely that the magazines subscribed for would not be in the category of magazines a hospital used and they would be of interest to Kenner. Without further discussion we hold for Kenner on the issue as to all three years. In the years 1949, 1950, 1951, 1953 and 1954 hospital funds were used to pay automobile expenses and gasoline charges. Kenner has the burden of proof for the years 1949, 1950 and 1951. The amended answers for 1953 and 1954 raised the issue of automobile expenses. Respondent admits he has the burden of proof for 1953. He also has the burden of proof for 1954. The stipulation of facts contains about 277 separate items of expense for the four years in question. We have attempted to summarize these items in the findings of fact. Kenner testified that in 1949 amounts spent for gasoline were used by the hospital vehicle for picking up supplies such as groceries and drugs. As to 1950, Kenner testified that all 47 of the automobile expense items in the stipulation for that year were hospital expenses, including two repair bills. As to 1951, Kenner testified that the amounts in question, 11 items totaling $151.54, were "all used *377 in the operation of the hospital." In this posture of the record we cannot say that Kenner has shown that these amounts were expenses of the hospital or that they were not expended for his benefit. Except by passing reference there is no evidence that the hospital owned any motor vehicles. None appear as assets in the hospital records which are in evidence except the hospital financial statement for 1951, under the heading "Investment in Rincon Hospital and Sanatorium * * *, Additions during 1951" there is listed "Station Wagon $2,440.35." The stipulation for the year 1949, in addition to gasoline expenses, lists amounts for truck parts and wheels totaling $26.79. The stipulation for 1950, in addition to gasoline expenses, shows approximately $724.47 for repairs and parts. The stipulation for 1951 shows amounts totaling $34.88 charged to Kenner Farms, $35.75 for the parts and repairs, and $72.71 for automobile insurance in addition to amounts spent for gasoline. Kenner's short answers that all these amounts were expended for the hospital, without other substantiation, is insufficient to carry his burden. Respondent relies completely on the stipulation to carry his burden. It shows *378 gasoline credit card charges billed to and paid by the hospital of $1,665.70 in 1953, along with the location and amount of each individual billing and the person who signed the charge slip. In 1954 the stipulation shows a total of $551.51 paid by hospital checks for fines and gasoline. This schedule shows the date, check number, payee, indicated purpose (presumably listed on the check or checkbook stub) and the amount. The stipulated schedule for 1953 shows that charge slips were signed by Schambach, an employee of Kenner's in his farming operations, for purchases in California, Arizona, Missouri, Texas, New Mexico, Oklahoma and at various points in Illinois outside of Chicago. Gasoline charge slips were signed by Kenner's son John at various points in Illinois and in Georgia, Indiana and Tennessee. John was not an employee of the hospital in 1953. Kenner signed gasoline charge slips in Chicago, Highland Park, Morton Grove, Springfield, Evanston, Antioch and Skokie, Illinois, and in Arizona. A number of the charge slips were signed in Chicago where the hospital was located. The stipulated schedule of payments by hospital check for 1954 contains two categories of payment: two items *379 totaling $6 to "Clerk of Mun. Ct. (Parking Viol.)" and seven items totaling $455.51 each listed as "Standard Oil Co., Monthly statement for gas on credit card." Although the evidence on this issue is meager, on the basis of the entire record we hold as follows: for the years 1949, 1950, and 1951 Kenner has not shown that respondent incorrectly included the amounts in issue in his income. For the years 1953 respondent is entitled to include $1,075.84 in Kenner's income which represents the total of all gasoline charge slips except those charges shown on the stipulation to have been signed in Chicago, those charges for which the stipulation shows no location and an unexplained item of $78.64 under date of March 25, 1953. For the year 1954 respondent has not met his burden of proof and is not entitled to include the stipulated amount of $551.51 in Kenner's income for 1954. The hospital paid $811.62, $241.66 and $259.21 in the years 1950, 1951, and 1953, respectively, for various liquors. Respondent included these amounts in Kenner's income in the original determination of deficiency. Kenner testified that the liquor was used "for the staff organization and the staff parties * * * *380 to try to build up our staff * * * it was all used as hospital entertainment." This testimony is unsubstantiated in any way. The stipulation for 1953 shos that at least a part of the amount was billed to Kenner's private residence at 632 Oakdale. The record is insufficient to permit us to overturn respondent's inclusion of these amounts in Kenner's income. During 1950 the hospital paid for air transportation to Arizona. Kenner testified that $203.90 was for his air transportation to Arizona "to see about the sanatorium." He further testified that an additional $100 expense from hospital petty cash paid for the same purpose "was spent for something for the hospital or the sanatorium. * * * It was strictly business. That's for sure." Both of these expenditures were made within a few days of the purchase by Altar of the Tucson property and the Lazy-V Ranch. We are somewhat less sure than is Kenner that these amounts were hospital expenses. Lacking any substantiation for Kenner's testimony, we hold respondent correctly included $303.90 in Kenner's income for 1950. The hospital expended certain sums for various miscellaneous expenses, which respondent added to Kenner's income. It was *381 Kenner's testimony that all of these items were expenses of the hospital's operation. Respondent has conceded some of the items on brief apparently on the basis of Kenner's testimony at trial, leaving in issue for the years 1949, 1950, and 1951 the sums of $398.45, $53.54, and $333.75, respectively. On the items remaining in issue, Kenner's testimony was insufficient to convince us that they were hospital expenses rather than his own. A few examples may serve to illustrate. One stipulated item was "Chicago Tribune (ad to sell Buick) $10.20." Kenner explained, "I don't know but I think the Buick belonged to the hospital at that time. We tried to sell it. I think that was a hospital car." Another stipulated item was "Stockyard Harness & Saddle (Halter lead & belts) $13.50." Kenner testified, "Well, I don't know what that was for. * * * I don't recall." We hold respondent correctly included the miscellaneous items which are in issue in Kenner's income for the years 1949, 1950, and 1951. During the years 1949 through 1953 the hospital paid certain amounts to Kenner's two sons for odd jobs done around the hospital. Respondent included these amounts in Kenner's income and argues that *382 the payments were not for services actually rendered but were the continuation of the boys' allowances and as such were income to Kenner. Kenner and both of his sons testified on this point. We have indicated in our discussion of the hospital's income above that we think the amounts paid them somewhat outstripped the reasonable value of the services they rendered. Although the boys' testimony was not as specific as might be desired, we find no reason to discount it entirely. We think it fairly appears from the record that they performed work for the hospital in their own right and that the amounts received by them were for their own benefit and in no sense income to their father. See Duval Motor Co., 28 T.C. 42. We hold respondent incorrectly included the amounts paid John and William in Kenner's income for the years 1949 through 1953. We turn now to the question of expenditure of hospital funds for the several properties in Arizona during the years 1950 through 1954. Respondent included all such expenditures in Kenner's income. Kenner testified that he intended to establish a sanatorium in Arizona for the treatment of vascular and arthritic disorders as an adjunct *383 to the Chicago hospital. In 1950 the hospital set up account #1470 on its books for monies expended on the Arizona properties. In the financial statements prepared at the end of each of the years 1950 through 1954 a balance sheet item appears entitled "Investment in Rincon Hospital and Sanatorium." This item reflects all payments of the charges to account #1470 in each of the years in question. These payments were as follows: Year
Amount
1950
$100,977.75
1951
25,366.33
1952
27,583.20
1953
58,823.06
1954
80,122.88
Total
$292,873.22 Respondent's position is that these amounts were income to Kenner for the several years involved. Respondent argues that these amounts were spent for Kenner's use and benefit because they were expenditures to purchase, develop and improve property owned by Altar, Kenner's wholly-owned corporation, or by Kenner himself, and that therefore such payments should be considered additional income to him. Kenner argues that these amounts were expended for the benefit of the hospital because the hospital planned to develop the sanatorium for vascular and arthritic ailments on the Tucson property and a tuberculosis sanatorium on the *384 ranch; because the hospital leased a portion of the acquired properties; and because the improvements which were made were made for the benefit of the sanatorium. In general, Kenner has the burden of proof on this issue for the years 1950, 1951, 1952, and 1953 and respondent for 1954. There are several limitations, however, which will be discussed below. In 1950 the ranch and apartment and hotel property in Tucson were purchased by Altar. Account #1470 shows $100,977.75 of hospital funds was used in 1950 for purchase price payments and improvements in connection with these properties. Kenner testified that the Tucson property was purchased for a sanatorium but when it was discovered that considerable sums would have to be spent to repair or replace the plumbing systems, it was decided to abandon the plans for establishing the sanatorium there. About 18 months elapsed between the time of purchase and the time of disposal of the Tucson property. During that time rooms and apartments were rented and the property was managed by a resident manager who looked to Kenner for instructions as to the operation of the property. Repairs and improvements to this property and the manager's salary *385 were paid from hospital funds. Kenner testified that the hospital leased the Tucson premises and 10 acres of the Lazy-V from Altar. Although no original lease was shown to the Court, in support of this testimony he introduced in evidence what purported to be a copy of the lease. Respondent also introduced in evidence a document purporting to be a copy of a lease. Both were similar but not identical. Kenner's testimony concerning the two documents was rather inconclusive. As to the lease which dealt with both the Tucson and Lazy-V property, Kenner testified that it was "in effect" only while the Tucson property was owned by Altar but that "we did reject that [lease] when we sold the Tucson property." Thereafter, according to Kenner's testimony, the lease which covered only the Lazy-V property was "in effect." He also testified as to the first lease, "I don't know if it was ever signed." As to the second lease, he testified, "Oh, yes", it had been signed, but when asked when it was signed he answered, "I don't recall"; when asked where he signed it, he replied, "I don't recall that" and when asked whether anyone had witnessed his signature, he said, "I don't remember." At various *386 points in his testimony Kenner stated that the transactions dealing with the Arizona properties were all entered into with the full sanction of the hospital board of directors. The hospital directors were appointed each year by the three "members" of the corporation: Kenner, his wife, and another. In 1950 there were five directors appointed, including both Kenner's sons. William Kenner, III was elected president of the board of directors for 1950. In that year he was 22 years old and John was 20. In every year after 1951 at least one member of Kenner's immediate family served on the board of directors. The minutes of the meetings of the hospital board of directors for the years 1950 through 1954 were placed in evidence by respondent. The minutes for 1950 make no mention of the Arizona transactions. The only such reference in the corporate minutes for 1951 merely authorizes Kenner "to negotiate for a sanatorium for the aged and incurables such as arthritics and asthmatics." The corporate minutes for 1952 contain a resolution authorizing Kenner to "spend such sums out of the available funds of this corporation as are necessary to open and operate" Rincon Sanatorium. Other references *387 to the Arizona operations appear in the corporate minutes for the years 1953 and 1954. If there was a lease of Altar property to the hospital in 1950, it would conceivably have been signed by Kenner or his son as director or president of the hospital and by Kenner as president of Altar. In situations such as this where taxpayers deal with themselves in several capacities this Court has often been urged to the strictest scrutiny of the transactions to insure that the taxpayer acts in purposeful compliance with the roles in which he has cast himself. We think Kenner has not proved that the hospital did lease the Tucson property and a portion of the Lazy-V Ranch. There is some evidence that a sanatorium in Arizona was contemplated. Much of it postdates the beginning of Kenner's income tax troubles. [21] It has not been shown that any of the property purchased by Altar was ever transferred to the hospital corporation. And, as stated earlier, it was not until 1957 that the Hill House property (originally purchased by Kenner with hospital funds) was transferred to the hospital. No sanatorium was ever operated on any of the properties. The improvements and repairs and other expenditures *388 in connection with the Arizona properties were more consistent with the operation of the properties as a hotel, an apartment building and a ranch operation for profit by Altar and Kenner, rather than preparation of any of the properties for a sanatorium. Kenner argues the plan for the sanatorium was not carried out because of respondent's determinations of the tax liabilities here involved. We are of the opinion under the whole record that the investment in the Arizona properties was Kenner's investment and that of Altar which Kenner financed with hospital funds; that the hospital funds, which the financial statements show expended for Arizona properties during the years 1950 through 1954, were expenditures for Kenner's benefit and properly chargeable to him during said years. Respondent determined the additions to Kenner's income, using the alternative assumptions that the hospital was not a separate taxable entity and hospital's income was really his, or that it was a separate entity and the hospital payments for Kenner's benefit constituted income to Kenner. The dollar amount of the deficiency and additions *389 to tax were computed by respondent by including in Kenner's income the amount derived under the first alternative, that is, that the hospital was not a separate entity. At trial counsel for respondent announced that respondent abandoned the first alternative and elected to base the case on the second alternative, that is, that the hospital was a taxable entity apart from Kenner and the payments out of hospital funds to or for Kenner constituted income to him. However, in the years 1949 and 1950 the amount of income derived under the first alternative was smaller than that arrived at by the second alternative on which respondent elected to stand. Because of this, respondent has claimed an increase in the deficiency and additions to tax for these years by merely amending the prayer of the answer. Such amendments are not allegations of new matter. All that respondent has done in these two years is to attempt to increase the dollar amount of the deficiencies without pleading any new matter, the proof of which would justify such increases. Actually, such an amendment of a prayer is meaningless in so far as it attempts to increase the dollar amount of the deficiency determined in the original *390 determination. A determination made by respondent in his 90 day letter cannot be increased. In the answer he can claim an increase only by allegations of fact which, if proven by respondent, will support the increase. The practical effect of all of this is that Kenner's total dollar deficiencies for the years 1949 and 1950, determined on the basis of this opinion, will be no more than the amounts originally determined in respondent's determination of deficiencies for said years. For the year 1954 a slightly different situation appears. In the deficiency notice for that year respondent used no alternative assumptions. The deficiency was determined on the assumption that the hospital was not a separate taxable entity. By amended answer respondent changed his position completely and claimed a deficiency based on the ground that the hospital was a separate taxable entity and that the amounts appearing in hospital account #1470 were income to Kenner. As to this year, on this issue respondent admits he has the burden of proof of the entire amount. Our findings, as discussed above, in effect sustain respondent's burden of showing that amounts expended in 1954 by the hospital in Arizona *391 were income to Kenner. The $80,122.88 amount for 1954 is supported by account #1470 and also by the hospital's annual financial report for the year ended December 31, 1954, where, however, it appears as $80,152.88. In the statutory notice for 1949 respondent determined that Kenner made a cash withdrawal of $15,000 from the hospital account. Kenner presented no evidence as to this amount and did not mention it in his original brief. In his reply brief Kenner "[alleges] that this is part of the cost of the zoning variation necessary for the operation of the Hospital." Because this "allegation" is unsupported by any evidence, we hold respondent correctly included this amount in Kenner's income for 1949. Respondent disallowed certain expenses of Kenner's farming operations in the determination of deficiency for 1949. After several concessions, $5,878.21 remains in issue. Kenner has presented no evidence on this point. Accordingly, we hold for respondent. By amended answer for the year 1949, respondent alleged that Kenner had a longterm capital gain of $11,623.89 and that the taxable portion, $5,811.95, had not been reported on Kenner's 1949 income tax return. Respondent has not *392 introduced any evidence on this point. Therefore we hold for Kenner on this issue. In the determination of deficiency for 1951 and 1954 respondent increased Kenner's income by $2,419.29 and $5,520.97, respectively, for the sale of farm produce to the hospital. Kenner has introduced no evidence on this point. Accordingly, we hold respondent may include these amounts in Kenner's income in 1951 and 1954. At trial both parties orally conceded a number of the adjustments in the statutory notices. Later, on brief, the parties summarized the concessions which had been made. At trial respondent conceded that a depreciation adjustment in Kenner's income tax return for the year 1950 in the amount of $374.29 had been incorrectly disallowed. Although respondent does not mention this amount in his summary on brief, it will be considered conceded by him. In the deficiency notice for 1953 respondent disallowed certain farm expenses of which a $10,570.64 loss on the sale of livestock remains in issue. Kenner testified that amount "was due to the decrease in cattle prices." This is not sufficient evidence to carry his burden of proof. We hold respondent correctly disallowed this amount as a deduction. *393 In the deficiency notice for 1954 respondent disallowed a claimed loss on the sale and death of livestock of $6,290, other farm expenses of $1,030.42, a deduction of $700 for sick pay exclusion, and a deduction of $2,134.40 for business expenses. Kenner testified that in 1954, 39 cows and 36 calves died of accidental poisoning in a pasture which had been sprayed with weed killer. He testified that these were his cattle, purchased with his own money. A bulldozer operator who buried these cattle for Kenner also testified. We are satisfied that Kenner owned these cattle and that he suffered a loss from their untimely demise. Kenner's only proof of his basis in these cattle is the amount which appears on his income tax return. Under the rule of Cohan v. Commissioner, supra, in the exercise of our best judgment we hold that Kenner suffered a loss of $10 per head or $750 from the death of the cattle and may deduct this amount for that year. Kenner has produced no evidence and so has failed in his burden of proof as to the other items mentioned above in issue for 1954. We hold respondent correctly disallowed them in 1954. Additions to Tax Respondent determined additions *394 to tax in all of the dockets involved in this case. He determined additions to tax under section 293(b), Internal Revenue Code of 1939, in Docket No. 59823 against the hospital for the years 1944 through 1948, against Kenner in Docket No. 59068 for the years 1944 through 1947, and against Kenner and his wife in Docket No. 59069 for the year 1948. He determined additions to tax against the hospital in Docket Nos. 59823 and 76999 under section 291(a), Internal Revenue Code of 1939, for the years 1944 through 1953 and under section 6651(a), Internal Revenue Code of 1954 for the year 1954 for failure to file a return. He determined additions to tax under section 294(d)(1)(A), Internal Revenue Code of 1939, for failure to file a declaration of estimated tax, against Kenner in Docket No. 59068 for the years 1945, 1946 and 1947; against Kenner and his wife in Docket Nos. 59069, 76717 and 74307 for the years 1948, 1949, 1950, 1951, 1953 and 1954. He determined additions to tax under section 294(d)(2), Internal Revenue Code of 1939 for substantial underestimate of estimated tax against Kenner in Docket No. 59068 for the years 1944, 1945, 1946 and 1947 and against Kenner *395 and his wife in Docket Nos. 59069, 76717 and 74307 for the years 1948, 1949, 1950, 1951, 1952, 1953 and 1954. Respondent also determined deficiencies in declared value excess profits tax and excess profits tax of the hospital for the years 1944 and 1945. At trial and on brief respondent made the following concessions in regard to the additions to tax set forth above: neither the hospital, nor Kenner, nor Kenner and his wife are liable for additions to tax under section 293(b), Internal Revenue Code of 1939, for any of the years 1944 through 1948; under the authority of Commissioner v. Acker, 361 U.S. 87, Kenner is not liable for additions to tax under section 294(d)(2), Internal Revenue Code of 1939, for the years 1945, 1946 and 1947 and Kenner and his wife are not liable for additions to tax under said section for the years 1948, 1949, 1950, 1951, 1953 and 1954 since no declarations of estimated tax were filed for those years. As to the additions to tax which remain in issue, we hold as follows: The hospital corporation has offered no evidence to show that its failure to file returns was due to reasonable cause and not to willful neglect, except in so far as its general *396 argument that it was an exempt organization applied to this issue. On this ground the record does not justify a finding that the failure to file returns was due to reasonable cause and not to willful neglect. See Fraternal Order of Civitans of America, 19 T.C. 240. Accordingly, additions to tax under section 291(a), Internal Revenue Code of 1939, for the years 1944 through 1953, and under section 6651(a), Internal Revenue Code of 1954, are approved. Kenner produced no evidence that his failure to file a declaration of estimated tax for the years 1945, 1946, 1947 and Kenner and his wife produced no evidence that their failure to file a declaration of estimated tax for the years 1948, 1949, 1950, 1951, 1953 and 1954 was due to reasonable cause and not to willful neglect. Additions to tax under section 294(d)(1)(A), Internal Revenue Code of 1939, are approved for those years. Additions to tax for Kenner and his wife for the years 1944 and 1952 under section 294(d)(2) are approved if it appears after the Rule 50 computation that the statutory requirements are met. The deficiencies determined against the hospital for declared value excess profits *397 tax and excess profits tax for the years 1944 and 1945 are approved to the extent they are computed in accord with the Rule 50 computation of the hospital's income for those years. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: William H. Kenner and Eleanor V. Kenner, Husband and Wife, Docket Nos. 59069, 74307 and 76717; Kenner's Charitable Hospital, Inc., Docket No. 59823 and Kenner's Charitable Hospital, Inc., an Illinois corporation not-for-profit, Docket No. 76999.↩
**. See footnote 6.↩
*. Under section 6651(a), Internal Revenue Code of 1954↩. *. Under section 6651(a), Internal Revenue Code of 1954↩.
2. This amount was stipulated as $88,820.12. The stipulation contains an arithmetical error of $0.10.↩
3. The amount of land originally appears as 6.2 acres in the several agreements concerning it. This was later corrected to 10.8 acres and is referred to as such herein.↩
4. We have found no evidence in the record concerning payment of the remaining $25,000 of the agreed purchase price of the Lazy-V.↩
5. The sum of these stipulated amounts is $139,282.70. The difference of $717.30 between this total and the $140,000 purchase price is unexplained.↩
*. One writing uses the word "Kenneth" at this point.↩
6. Respondent's amended answer states, in part: "the correct deficiencies * * * for the years * * * 1950 * * * are as were determined by the Commissioner as follows: Year
Deficiency
25% Penalty
* * *
* * *
* * *
1950
$48,854.74
$10,963.69" The original deficiency notice shows the deficiency for 1950 as $43,854.74 and a 25% penalty of $10,963.69. We assume from the context that the $48,854.74 figure appearing in the amended answer is a typographical error and that the correct amount is as stated in the original deficiency notice, i.e., $43,854.74.↩
7. Respondent's computation of this amount seems to contain two errors. In Docket No. 76999 respondent alleged that unreported income from the hospital in 1953 was $148,201.38. By amended answer he increased this amount by $2,125.70 to $150,327.08 and explained the increase by alleging $2,125.70 was paid by the hospital to satisfy Kenner's personal obligations and deducted by it as expenses. By amendment to the amended answer respondent alleged that the hospital's unreported income for 1953 should be $153,084.44 (an increase of $3,477.36 over the amount in the amended answer) and explained this increase by alleging that the $2,125.70 amount should be increased to $4,603.06 (an increase of $2,477.36). The $1,000 discrepancy between the two related allegations in the amendment to the amended answer is unexplained. The amendment to the amended answer shows respondent arrived at the amount of $4,603.06 as follows: 632 Oakdale Avenue
$1,065.70
3101 N. Sheridan Road
960.00
$2,125.70
Gas
15.90
Laundry
333.46
Electricity
51.36
Telephone
133.68
Liquor
250.21
Magazines
27.00
Gasoline
1,665.75
Total
$4,603.06 Respondent committed an arithmetical error. The first two items total $2,025.70. The correct total, per table, should be $4,503.06.
*↩
8. Certain items included in this figure have been conceded by respondent and are not detailed here.↩
9. Certain items included in this figure have been conceded by respondent and are not detailed here. ↩
10. In the motion to file an amendment to the amended answer respondent states that the "deficiency * * * [was] computed in the notice of deficiency without reference to respondent's alternative determination."↩
11. Certain items included in this figure have been conceded by respondent and are not detailed here.↩
12. Certain items included in this figure have been conceded by respondent and are not detailed here.↩
13. Certain items included in this figure have been conceded by respondent and are not detailed here. ↩
14. Respondent on brief subtracts $2,789.01 from $5,084.67 and arrives at $2,447.36. There is no indication that either the minuend or the subtrahend is incorrect, therefore we conclude that the error is an arithmetical one.↩
15. This amount should be $2,025.70. See footnote 7. ↩
16. The parties have stipulated that $2,125.70 [$2,025.70] was paid for rent on the apartments at 632 Oakdale and 3101 North Sheridan Road in 1953. Kenner has raised no question of inaccuracy of the pleadings. We therefore, consider the use of the year 1952 here a typographical error.↩
17. In paragraph 4(d) respondent alleged that the amount derived from the hospital should be $88,807.55. The total of the amounts set forth in paragraph 7 is $85,207.55. There is no explanation of the $3,600 discrepancy in these amounts. On brief respondent refers only to the $85,207.55 amount.↩
18. This amount should be $2,025.70. See footnote 7.↩
19. In his notice of deficiency respondent determined Kenner had received in each of the years 1944, 1945 and 1946 the amounts which he, by the net worth method, had determined to be the hospital's income or the sum of $84,963.06 for each year. In his amendment he receded from his position and alleged the specific items of withdrawal (which were later stipulated) were the sums to be added to Kenner's income.↩
20. For the year 1950 respondent claimed an increased deficiency by amended answer. For a discussion of the effect of this increase, see infra. The amendment does not affect petitioner's burden as to the $6,686.96 amount.↩
21. The record shows audits by the revenue agents started in 1950.↩